**UNION ELECTRIC COMPANY d/b/a Ameren UE, Appellant,**

v.

**PUBLIC SERVICE COMMISSION OF The STATE of Missouri, Office of the Public Counsel and State of Missouri by the Office of the Attorney General, Respondents.**

**No. WD 61610.**

Missouri Court of Appeals, Western District.

June 8, 2004.

James B. Lowery, Columbia, MO, James J. Cook, Steven R. Sullivan and Thomas M. Byrne, St. Louis, MO, Robert J. Cynkar and Victor J. Wolski, Washington, DC, for Appellant.

Dana K. Joyce, General Counsel, and Steven Dottheim, Chief Deputy General Counsel Jefferson City, MO, for Respondent Ameren UE.

John B. Coffman, Acting Public Counsel, Jefferson City, MO, for Intervenor–Respondent Office of the Public Counsel.

Jeremiah W. (Jay) Nixon, Atty. Gen., and Ronald Molteni, Assistant Attorney General, Jefferson City, MO, for Intervenor–Respondent State of Missouri.

Before HOWARD, P.J., and LOWENSTEIN and HARDWICK, JJ.

VICTOR C. HOWARD, Presiding Judge.

Union Electric Company ("UE") appeals from Reports and Orders of the Public Service Commission (the "Commission") interpreting and adjudicating the terms of an experimental alternative regulation plan ("EARP") used to calculate credits by which UE's customers shared in UE's earnings. For the reasons set forth below, we affirm the Reports and Orders of the Commission.

## Background

Two EARPs were created by Stipulations and Agreements signed by UE, the Office of Public Counsel ("OPC"), the Staff of the Commission ("Staff"), and representatives of the major industrial customers of UE. The EARPs were alternative regulation plans designed to reduce the need for formal regulatory proceedings and streamline the process of dealing with excessive earnings and rate issues.

The EARPs were the result of negotiations among the parties to resolve issues raised by a Staff audit indicating UE's revenues and rates required a reduction in order to accurately reflect its cost of service. To avoid a contested rate case, an agreement was reached, which, among other things, provided UE's Missouri retail electric customers with a one-time credit

of $30 million and a $30 million annual rate reduction. The agreement also established the first EARP.

Each EARP ran for a period of three years, with each year constituting a "sharing period." The Commission approved the first EARP by an order on July 21, 1995, and it ran from August 1, 1995, through June 30, 1998. The second EARP was approved on February 21, 1997, and encompassed the period from July 1, 1998, through June 30, 2001. The Commission opened a case to monitor each EARP and resolve disputes that might arise in their operation. Upon the expiration of the second EARP, UE reverted to traditional utility regulation on July 1, 2001.

Among other things, the EARPs established a method to provide for annual "sharing credits" to enable UE's electric customers to share in company earnings. These credits were to be based upon a calculation of UE's earnings after each twelve-month "sharing period." UE's earnings were to be analyzed, in part, pursuant to certain agreements regarding the cost of service and a rate of return "sharing grid."

Under the three-level sharing grid, UE would keep 100 percent of its earnings up to a 12.61 percent return on equity ("ROE"). If the ROE exceeded 12.61 percent, the earnings in excess of this amount were split equally between UE and its customers, up to a 14 percent ROE. UE's customers were entitled to 100 percent of UE's earnings above a 14 percent ROE. A "reconciliation procedure" was used to produce an annual report reflecting UE's calculation of its ROE and the sharing credits for the period.

### Proceedings Before the Commission and Circuit Court

During the sharing periods of both EARPs, differences arose regarding the correct quantification of sharing credits owed to customers. The disagreements about the first two sharing periods of the first EARP and all three sharing periods of the second EARP were resolved by Stipulations and Agreements, which were approved by orders of the Commission. However, the parties were unable to resolve all of the disputes regarding the third period of the first EARP.

For this disputed period, UE filed an earning and sharing report proposing that its customers were entitled to a credit of $26,085,000. However, the Staff and OPC proposed six specific adjustments to the calculation that would have raised the sharing credits to $41,128,000. These contested adjustments were litigated before the Commission, and on December 23, 1999, the Commission issued a Report and Order that adopted and approved four of the Staff's recommended adjustments and decided in UE's favor on the other two. The Report and Order (clarified by the Commission's February 29, 2000, Orders) required UE to make the four adjustments and directed UE to issue sharing credits to its customers in the amount of $28,375,000, to implement a rate reduction totaling $16,321,000 to begin April 1, 2000, and to issue rate reduction credits to its customers for the excess amount billed from September 1, 1998, to the effective date of the rate reduction, April 1, 2000.

UE sought relief in circuit court by filing two Petitions for Review that addressed the various Commission Orders it disputed. UE claimed that the credit ordered by the Commission exceeded the lawful amount by $2,290,000. It claimed the rate reduction ordered was excessive by $370,000 and the rate reduction credit ordered was excessive by $479,305. The circuit court partially stayed the Commission's Order and directed UE to place the disputed amounts in an interest-bearing

account pending judicial resolution of the matter. On May 17, 2002, the court issued its Findings of Fact, Conclusions of Law and Judgment affirming the Commission's Order and subsequently, pursuant to Section 386.540.3, suspended its Judgment.

### Issues on Appeal

UE contends that the Commission misapplied and/or misinterpreted the 1995 Stipulation and Agreement that created the first EARP and, as a result, unlawfully ordered four adjustments to UE's accounting for various expenses, thereby improperly increasing the sharing credit. The four contested adjustments are:

**1. COMPUTER SOFTWARE MAINTENANCE EXPENSES ("Y2K Costs"):** UE claims the Commission improperly adjusted its expenses for these costs. UE included expenses in the third sharing period for software work performed to modify its computers for the Y2K problem. UE characterized these costs as a subset of the type of computer software maintenance expenses it has incurred since its first computer was installed and not as a new category of costs never previously included in any ratemaking proceeding. UE contended it could take the costs as an immediate expense because the software was not improved beyond its original state, but was merely restored to its normal working state. The Commission determined that UE's Y2K costs were a category of costs that had never been included in a prior ratemaking proceeding and, therefore, could be considered according to the terms of the EARP. It further held that Y2K costs should not be expensed because of the unusual and nonrecurring nature of these costs. The Commission ordered the costs deferred until the project was completed and all facts regarding the reasonableness and prudence of the expenses

were available and an appropriate method of recovery could be determined.

**2. DECOMMISSIONING TRUST FUND DEPOSITS:** UE is required to periodically estimate the cost of decommissioning the Callaway nuclear power plant and make quarterly payments into a trust fund to defray those costs. UE's 1997 trust fund deposits were delayed in order to obtain an IRS ruling that would enable the trust fund contributions to be tax-deductible. Due to the unusual delay of the 1997 payments, the Commission found that, because UE collected decommissioning costs through utility rates but did not pay out the costs until 1998, it received access to a cost-free source of capital. The Commission ordered UE to apply an interest rate to the funds and increase its revenue by the resulting amount. This increase in revenue would then be factored into the sharing grid to benefit ratepayers. The Commission contends that the EARP authorized these adjustments because it was a category of costs not previously a part of a ratemaking proceeding and because it was an unresolved issue relating to the operation or implementation of the EARP. UE claims the Commission's treatment of the deposits improperly added to its revenues.

**3. TERRITORIAL AGREEMENTS:** Electric utilities may enter into territorial agreements among each other to exchange territories and customers if, after a hearing, the agreement is approved by the Commission as "not detrimental to the public interest." § 394.312.4 RSMo 2000. Two such UE agreements, one with Black River Electric Cooperative and one with Macon Electric Cooperative, were approved, but the Commission made no ratemaking determinations, leaving those issues open for later proceedings. During the approval process, the Staff reserved the right to address in future proceedings

the effect of the agreements on UE's earnings and future sharing credit calculations. Subsequently, the Commission found that, as a result of the territorial agreements, UE's income declined, which constituted a detriment to the public interest. The Commission reversed these losses, thereby adjusting the sharing credits calculation to prevent any detrimental effect of the agreements from flowing to the ratepayers. The Commission claimed the right to make these adjustments because the territorial agreements' effect on earnings had not been the subject of a previous ratemaking proceeding and because the disputed issue was related to the operation or implementation of the EARP. UE claims its revenues were artificially increased by the way the Commission treated the territorial agreements.

**4. MERGER AND ACQUISITION COSTS:** This issue is different from the previous three because it does not involve an interpretation of the July 1995 Stipulation and Agreement that spawned the first EARP. Instead, it involves an interpretation of a 1996 Stipulation and Agreement regarding UE's application to merge with CIPSCO, Inc. The Commission in February of 1997 approved the Stipulation and Agreement allowing the merger. The agreement's language provided a methodology for UE to recover, from the ratepayers, appropriate costs incurred to accomplish the merger (transaction costs) and pay for the subsequent post merger transition (transition costs). These costs are known in this appeal as "merger and acquisition costs." A dispute arose between the Staff and UE as to how these costs should be amortized in accordance with the language of the Stipulation and Agreement. UE contends the Commission ordered a change in the methodology being used by UE to amortize these costs and improperly imposed an adjustment to revenue.

UE has five points on appeal, all alleging the Commission erred in ordering the above four adjustments. The first point challenges the authority of the Commission to order the adjustments. The second point alleges that even if the Commission did have such authority, three of the four adjustments were not supported by substantial and competent evidence. The last three points set forth UE's assertion that the adjustments unlawfully violate its constitutional rights.

### Standard of Review

■ We review the decision of the Commission, not that of the trial court. *State ex rel. Office of Pub. Counsel v. Pub. Serv. Comm'n,* 938 S.W.2d 339, 341 (Mo. App. W.D.1997). The scope of judicial review is restricted. We presume the Commission's order is valid and the challenger (UE) bears a heavy burden to demonstrate invalidity. *State ex rel. Util. Consumers Council of Mo., Inc. v. Pub. Serv. Comm'n,* 585 S.W.2d 41, 47 (Mo. banc 1979). The Commission is a fact-finding agency and its findings are considered prima facie correct; we will not weigh the evidence. *State ex rel. Inman Freight Sys., Inc. v. Pub. Serv. Comm'n,* 600 S.W.2d 650, 654 (Mo.App. W.D.1980). On issues within the expertise of the agency, we will not substitute our judgment for that of the Commission. *State ex rel. Mo. Pub. Serv. Co. v. Pierce,* 604 S.W.2d 623, 625 (Mo.App. W.D. 1980).

■ Our review has been described as "two-pronged": first, we must "determine[ ] whether the Commission's order is lawful; and second, we must determine whether the order is reasonable and based on competent and substantial evidence upon the whole record." *Friendship Vill. of S. County v. Pub. Serv. Comm'n,* 907 S.W.2d 339, 344 (Mo.App. W.D.1995) (cita-

tion omitted). Reasonableness depends on whether the order is arbitrary or capricious or is against the overwhelming weight of the evidence. *State ex rel. Chicago, R.I. & P.R. Co. v. Pub. Serv. Comm'n*, 312 S.W.2d 791, 796 (Mo. banc 1958). Lawfulness turns on whether the Commission had the statutory authority to act as it did. *State ex rel. Beaufort Transfer Co. v. Clark*, 504 S.W.2d 216, 217 (Mo. App. W.D.1973).

## Discussion

### A. Did the Commission have the authority, either legally or by the terms of the EARP, to make the four disputed adjustments?

UE's first point disputes the Commission's authority to make the adjustments. Specifically, UE claims the Commission erred, because neither the Commission's enabling statute nor any provisions of the EARP authorized it to order the contested adjustments, in that each of the adjustments was either in direct conflict with or unilaterally changed the terms of the EARP. Thus, UE claims the changes were not lawful.

UE urges that the EARP is a contract that binds the Commission relative to its authority to supervise rates. The EARP does set forth negotiated guidelines to be followed by the parties and the Commission. And the Commission did approve and adopt the EARP. However, it must be clarified that the Commission is not a signatory to the EARP and never relinquished its role as arbiter. In its July 21, 1995, Order adopting the stipulation of the parties, the Commission made a finding that "any unresolved issue concerning sharing will be brought to the Commission." This finding was not challenged by UE at the time. The stipulation itself clarified that nothing in the stipulation was "intended to impinge or restrict in any manner the exercise by the Commission of any statutory right, including the right of access to information, and any statutory obligation."

■ That the Commission is charged with statutory obligations and duties regarding utility regulation is beyond question. We construe the EARP, not as an abdication of the Commission's responsibility to regulate, but as embodiment of it. It was an attempt to streamline the rate monitoring process and provided a means to resolve issues in lieu of the formal complaint process. The EARP contemplated extensive and continuous monitoring and embraced the recognition that not all items could be anticipated and addressed and that disputes could arise. The Commission's role is grounded in this recognition. That being said, we find that the Commission, in making the disputed adjustments, did not change or violate the terms of the EARP or its role thereunder. The terms of the EARP permitted the Commission's intervention into the areas of dispute between the parties.

The Commission relied on the following two provisions in the EARP to resolve disputes and make the contested adjustments:

1. **Paragraph 3.f.vii:** This provision provides that the parties "reserve the right to bring issues which cannot be resolved by them and, which are related to the operation or implementation of the Plan, to the Commission for resolution." It further states that examples of such disagreements include mechanics of calculating the report, violations of the Stipulation and Agreement, manipulations of earnings, or requests for information not previously maintained by UE.

2. **Paragraph 3.f.viii:** This provision provides that the parties "have the right

to present to the Commission concerns over any category of cost that has been included in UE's monitoring results and has not been included previously in any ratemaking proceeding."

The Commission used paragraph 3.f.vii as authority for its adjustments regarding the decommissioning fund deposits, territorial agreements, and merger and acquisition costs. UE points to a central feature of the EARP, the Reconciliation Procedure set out in Attachment C, to argue that the Commission improperly relied on the above paragraph 3.f.vii to make the contested adjustments. Attachment C sets out a number of accounting adjustments and instructions for the calculation of the earnings level upon which sharing credits would be based. UE contends that the language of the EARP gives this procedure an exclusive role in calculating the Sharing Credit amounts. It points to the language in section 3.f.i that provides: "The return on common equity for determination of 'sharing' will be calculated by using the methodology set out in Attachment C, Reconciliation Procedure, attached hereto." UE contends that, in light of what it calls the "direct, unequivocal mandate" that return on equity *will be calculated* according to the methodology set out in the Reconciliation Procedure, section 3.f.vii cannot be read to authorize the adjustments to the sharing credit.

Additionally, section 3.f.ii states that the parties "have conferred and determined what items, based on prior Commission Orders, should be excluded from the calculation of UE's return on equity." Given the language of the EARP, UE asserts the Reconciliation Procedure contains the precise methodology to be used to calculate UE's rate of return and allowing adjustments outside this methodology amounts to a unilateral and impermissible alteration of the parties' Stipulation and Agreement.

Although the Reconciliation Procedure does contain a number of discrete instructions for an accounting methodology to be followed when calculating earnings, it does not encompass every component involved in earnings calculations. So, for those situations and components not addressed in the Reconciliation Procedure, we are left with two potential solutions: (1) UE may choose the method of accounting with little or no Commission intervention, or, (2) the Commission may review disagreements that cannot be resolved by utilizing the Reconciliation Procedure.

Nothing in the 1995 Stipulation and Agreement mandates deference to UE's method of accounting for issues unforeseen or not addressed in the Reconciliation Procedure. On the other hand, in addition to the provisions mentioned above, a number of other provisions in the EARP refer to the Commission's role as arbiter. For example:

**Paragraph 3.f.ix** provides that "Differences among UE, Staff, OPC and other signatories will be brought to the Commission's attention for guidance as early in the process as possible."

**Paragraph 3.f.x** provides that "Signatory parties to this Stipulation and Agreement will have thirty (30) days after a final report is filed to provide notice that there may be areas of disagreement not previously brought to the attention of the Commission that need to be resolved."

These provisions undercut UE's position that the EARP was an automatic procedure requiring no Commission oversight absent an encounter with a remote and wholly unprecedented ratemaking issue or because of wrongful manipulation by UE. The designation of the Commission as arbiter of disagreements and an ability to make adjustments to resolve disputes go hand in hand.

We find that the disagreements between the parties involving the decommissioning fund deposits, territorial agreements, and the merger and acquisition costs "are related to the operation or implementation" of the EARP as contemplated by the language in paragraph 3.f.vii. Thus, the Commission could lawfully make the kind of adjustments it did. UE argues that the issues at hand do not fit any of the four examples of disagreements set out in the text of paragraph 3.f.vii. Even if that were the case, it is clear that these are just examples. There is no language limiting the disagreements to those listed.

As previously noted, Section 3.f.viii allowed the Staff "to present to the Commission concerns over any category of cost" not previously included in a ratemaking proceeding. A ratemaking proceeding was defined in this case by a Commission witness as a "rate increase case, a rate decrease case, or a sharing credits proceeding, but this term does not include territorial agreement cases." UE's position on this section is that it only applies to types of costs that were unprecedented. In other words, the provision allowed the Commission to resolve a cost that was a type of cost that UE had never before encountered or incurred. UE believes these costs could be dealt with by the Commission because UE would not have established an accounting treatment for such costs, and the parties would not have had an opportunity to propose a specific adjustment for such costs within the confines of the EARP. UE further argues that since UE has, in the past, dealt with issues involving computers, decommissioning costs, and territorial agreements, none of these costs were subject to the provisions of section 3.f.viii and were not subject to adjustment by the Commission.

We agree with the Commission's counter-argument that UE's interpretation of this provision would render it meaningless. UE's characterization would require reading the word "new" into the provision. In other words, instead of concerns over "any categories of cost," UE's interpretation would be "any new categories of cost." This reading would substantially limit the provision. In fact, UE's witnesses were hard-pressed in the hearing to come up with a single example of a cost fitting their interpretation. UE's witnesses testified that 3.f.viii protected the parties from a limited number of costs that could not be foreseen by the parties when they were negotiating the EARP. But, UE's witnesses were hard-pressed to think of an example of such a cost describing them as "rare" and "quite difficult to pinpoint exactly what type of cost would fall under this category." This interpretation would render the provision very close to a nullity. We find the provision was designed to allow the Commission to resolve issues concerning costs that were not previously addressed or were deferred until the Commission could more appropriately deal with them.

We believe the Commission's application of 3.f.viii was correct. The provision allowed costs not dealt with in a previous proceeding to be brought before the Commission to resolve issues relating to their treatment in UE's accounting. We find that the Y2K costs, the decommissioning trust fund deposits, and the issues arising from the territorial agreements were not the subject of a previous ratemaking proceeding, so those issues were properly brought to the Commission for resolution. As mentioned, the merger and acquisition issue is different, and we deal with it separately below.

Regarding the Y2K costs, the Commission had opened a generic docketing in August 1998 to ascertain the preparedness of Missouri's utilities to safely deal with

Y2K-related problems. In a questionnaire, UE estimated its Y2K costs in the $10– to $15–million range. The Commission determined that it was premature to decide whether the costs should be passed on to ratepayers, because the first order of business was to deal with the potential problems to avoid interruption of utility service. After that, an assessment of reasonable and prudent expenses would be more clear. Because the EARP was entered into in 1995, it could not have been structured in advance to address these largely unknown costs. Based upon the Staff's recommendation, Y2K costs were deferred until the project was complete, which was estimated to be sometime in the year 2000. We find these costs were not previously dealt with in a ratemaking proceeding and fall within the purview of paragraph 3.f.viii.

Pursuant to Commission Order, UE makes quarterly deposits into the Nuclear Decommissioning Trust Fund to fund the cleanup and retirement costs of the Callaway Nuclear Plant. The deposits are made in accordance with IRS regulations in order for UE to take advantage of tax-deductible treatment. UE's four 1997 quarterly deposits were delayed because the IRS did not permit the payments until UE received an order from the Commission approving its cost estimates and funding levels. The Commission issued its Order in January 1998, and the catch-up payments were made in March. The Staff proposed that because of the unusual delay in quarterly deposits, UE had the cost-free use of this money and should account for the increased income generated, which would in turn justify an adjustment of the sharing credits owed to ratepayers. We find that this unusual delay created an unexpected issue with regard to the treatment of income and costs that had never been a part of a previous proceeding. Therefore, the Commission was properly

able to entertain and resolve the issues relating to these retained funds as allowed by paragraph 3.f.viii.

By statute, utilities may enter into agreements exchanging customers or territories if the Commission determines the agreements are not detrimental to the public interest. The Staff proposed and the Commission adopted an adjustment affecting the shared credits to adjust for a decrease in earnings and net revenue caused by UE's territorial agreements with Black River and Macon. UE asserts that the adjustments made were not authorized because the net revenues resulting from the territorial agreements were addressed in the Commission cases approving the agreements and that UE's accounting for the agreements has been consistently applied since then.

During the approval proceeding for the Black River agreement, the Staff's recommendations were conditioned on the right to examine the subsequent effects of the agreement as a part of the EARP to determine whether an adjustment was warranted to ameliorate the short-term negative effects on earnings. With regard to the Macon territorial agreement, UE stipulated, during the approval process, that the Staff had "the right to re-examine the financial impacts of the territorial agreement as part of the annual sharing credits" within the framework of the EARP based upon more current data. Testimony below indicated that neither territorial agreement was the subject of a prior ratemaking proceeding and, thus, could be properly reviewed in accordance with section 3.f.viii.

We find that the provisions of the EARP, specifically paragraph 3.f.viii, permitted the Commission to review the issues relating to the Y2K costs, the decommissioning trust fund deposits, and the

territorial agreements to determine if adjustments were warranted. As stated previously, paragraph 3.f.vii permitted the Commission to review the issues relating to the decommissioning fund deposits, territorial agreements, and the merger and acquisition costs. Because the terms of the EARP authorized the Commission's adjustments, they were lawful. Point I is denied.

## B. Were the Commission's adjustments supported by substantial and competent evidence?

UE's second point asserts that the Commission's adjustments regarding the Y2K costs, the decommissioning trust fund deposits, and the territorial agreements were arbitrary, capricious, unreasonable, and not supported by substantial and competent evidence of record. Specifically, with regard to the Y2K costs, UE contends that the adjustment was proper only if the evidence demonstrated that the costs were unusual, non-recurring, and extraordinary.

■ **1. The Y2K Costs:** UE's position is that the Y2K costs were simply a part of the cost of maintaining and repairing computer software programs to insure they perform their functions as originally intended. In other words, the costs were merely part of the ongoing cost of preventing the failure of the systems and were in no way extraordinary. Therefore, UE believes it should be allowed to expense the Y2K costs in the year incurred rather than capitalize them over time.

Staff testimony focused on the unusual and extraordinary nature of the costs that justified an amortization over a reasonable period of time. This approach would not only avoid an unduly heavy burden for ratepayers in the year the costs were incurred, but it also takes into consideration that future customers should share the burden, because they would reap the benefits of Y2K compliance. Among the reasons the Staff cited for its conclusion that the costs were extraordinary were: the sheer size of the expense, $671,709, in the third sharing period alone; that the expenses were ongoing from 1997 until 2000, when there should be no similar future expenses; and the fact that the issue was of an unprecedented, nationwide scope.

Other evidence before the Commission noted presidential and congressional action on the issue regarding readiness and liability. UE's 1998 Annual Report to Shareholders devoted more than a page of text to the issue, and UE formed an Executive Steering Committee, a Project Management Team, and thirty Function Area Teams to address the problem.

There is sufficient evidence in the record to justify the Commission's finding that the Y2K problem and UE's resulting expenses were unusual, would not be recurring, and should be deferred until the project is complete, when the prudence of the expenditures and the appropriate method of recovery can be determined. We find the Commission's Order reasonable and supported by competent and substantial evidence upon the whole record.

■ **2. The Decommissioning Trust Fund Deposits:** In its specific assignment of error regarding the decommissioning trust fund deposits, UE alleges that the Commission's adjustment could only be made if the evidence justified the conclusion that UE had a net negative cash working capital balance of greater than $24 million. We find sufficient evidence to support, and UE does not dispute, the Commission's finding that UE did receive a benefit from interest earned from the time the decommissioning trust fund deposits were billed and collected until the delayed payment of the required 1997 quarterly deposits in March 1998. The

Commission then used this finding to order UE to account for this cost-free use of capital as "other income and deductions" by calculating interest on the amount of the delayed payments. As clarified in the Commission's January 25, 2000, Order Denying Applications For Rehearing and Granting Motion For Clarification, the Commission initiated the adjustment to increase company revenues by the amount of the interest UE earned on the money, and the appropriate portion of it "would flow to the ratepayers in the form of sharing credits." However, UE's argument focuses on whether this adjustment conflicts with the Stipulation and Agreement of the parties regarding cash working capital.

Cash working capital measures the amount of cash and other liquid funds necessary to cover day-to-day expenses. If customer payments exceed the utility's expenses as they come due, it creates "negative working capital," which is subtracted from the utility's rate base. If the utility's expenses come due before sufficient customer payments are received, the difference comes from the utility's investors in the form of "positive working capital," which is added to the rate base. UE points to language in Attachment C of the EARP's Reconciliation Procedure where the parties agreed to utilize a fixed cash working capital rate base offset of $24 million for its annual EARPs earnings report. UE argues that to justify the adjustment, there would have to be evidence that UE's negative cash working capital exceeded the agreed-upon $24 million figure. UE contends that there is no such evidence and, further, that the adjustment unfairly isolated just one factor in the cash working capital calculation.

The Commission counters by pointing to evidence that the parties' agreement regarding cash working capital was not affected by the adjustment. Evidence from the Staff indicated that the $24 million cash working capital rate base offset was only based on traditional items found in a normal rate case, not unforeseen funds available due to a delay in payments. Thus, these funds were not contemplated or a part of the parties' negotiations regarding the rate base. The OPC put forth evidence that the decommissioning funds became a cost-free source of capital that should not be included in the cash working capital calculation; were not intended to be utilized as a source of capital to fund daily operations; and were not a non-plant investment necessary to sustain the ongoing operations. Thus, the unusual circumstances justified an adjustment as a direct reduction to expenses and did not involve the provision for cash working capital in the Reconciliation Procedure's Attachment C as a rate base offset.

Both positions recognized the benefit to UE due to the unusual source of capital resulting from the delay in funding. We find that the Commission was justified by the evidence in concluding that the adjustment was not literally a cash working capital adjustment and, therefore, was not addressed by the working capital provision in the Reconciliation Procedure. We hold that the adjustment for the delayed decommissioning trust fund deposits was reasonable and supported by competent and substantial evidence upon the record as a whole.

3. **The Territorial Agreements:** Regarding the territorial agreements, UE argues that an adjustment could be properly ordered only if there was substantial and competent evidence that the two agreements resulted in a net loss of revenue to UE. UE contends that the only evidence regarding the effect of the agreements established a benefit to UE without a loss in revenue.

■ As previously indicated, the territorial agreements were approved by the Commission without a determination of their financial effects after the Staff recommended approval conditioned on the right to examine, in future proceedings, the effect of the agreements on UE's earnings and future sharing credit calculations. The Staff was concerned that implementation of the contemplated transfer of customers would demonstrate a failure of the agreements to meet the "not detrimental to the public interest" requirement of Section 394.312.4.

The Commission in its December 23, 1999, Report and Order found that, indeed, there had been a loss of revenue and customers as a result of the territorial exchanges. This prompted the Commission to adjust for short-term decreases it found in UE's revenues to avoid any detrimental impact on customers under the sharing credit scheme of the EARP.

The evidence indicated that the Staff's study of the effect of the Black River agreement indicated a resulting loss of nearly 6,000,000 kwh of load and more than $400,000 in revenue, which would be partially offset by a reduction of costs and expected growth potential for the area being exchanged. The bottom line of this analysis showed a negative short-term effect on earnings with increased positive earnings in the future. The short-term negative effect would occur during the period of time covered by the EARP with the expected increased positive earnings not being realized until after the EARP expired.

UE countered this evidence with a comparative study indicating an increase in revenue and kwh sales "for the twelve months ended June 1998 compared to the twelve months ended June 1996." UE also attacked the Staff's testimony because it was based on outdated 1995 data.

However, the Staff testified that UE's calculations were faulty because the data used was not based strictly on the confines of the exchanged territory, but rather, it encompassed the much larger area of the counties within which the affected customers were located. Evidence was also adduced that UE no longer had the ability to track the individual customers involved in the exchanged territory for comparison purposes. Also, the Staff alleged a deficiency in UE analysis because it did not properly consider two components, expenses and investment, in its determination of earnings.

Additionally, the Staff testified that it did attempt to update its figures and none of the information UE provided would change the analysis. There was also testimony that there had been no substantial change or customer growth in the specific territories since 1995 that would mitigate the need for an adjustment to compensate for short-term losses.

Regarding the effect of the Macon agreement, evidence was introduced indicating a net loss of approximately 2,200 customers and a loss of approximately $2 million in revenue. UE claimed there had been a net increase in revenue of $.197 million. However, this figure was challenged because of an "excess energy sales" calculation used by UE. The Staff contended UE arbitrarily assumed that any reduction in usage in summer months would be available for sale at the highest energy cost and included a double calculation for the highest cost of generation in the summer months.

In summary, there was substantial and competent evidence supporting the Commission's adjustment for short-term losses resulting from the territorial agreements, and the adjustment was reasonable. The adjustment alleviated any detrimental ef-

fect to the ratepayers that the losses would have had in the sharing credit calculation of the EARP.

### C. Was the Commission's adjustment regarding the Merger and Acquisition Costs unreasonable and arbitrary?

██ Turning to the Commission's adjustment regarding the merger and acquisition costs, we again note that this issue is different because it does not principally involve an interpretation of the 1995 Stipulation and Agreement giving rise to the first EARP. Instead, the controversy relates to the interpretation and application of language in a 1996 Agreement and Stipulation involving UE's request to merge with CIPSCO, Inc. There is no dispute that the 1996 agreement allows UE to recover its merger and acquisition costs. The pertinent provision of the agreement, which is contained in Section 4, states:

> Actual prudent and reasonable merger transaction and transition costs (estimated to be $71.5 million, which reflects the total Ameren Corporation ("Ameren") estimated merger cost presented to the Commission Staff ("Staff") and Office of the Public Counsel ("OPC") in the UE/CIPSCO, Inc. Merger Implementation Plan, less executive severance pay of $1.6 million, but including costs incurred in 1995) shall be amortized over ten years beginning the date the merger closes. The annual amortization of merger transaction and transition costs will be the lesser of: (1) the Missouri jurisdictional portion of the total Ameren amount of $7.2 million; or (2) the Missouri jurisdictional portion of the total Ameren unamortized amount of actual merger transaction and transition costs incurred to date. No rate base treatment of the unamortized costs will be included in the determination of rate base for any regulatory purposes in Missouri.

The parties interpret this methodology in far different ways.

The Commission approved the merger in February 1997, but the deal did not close until the end of December 1997, which meant that UE did not begin to book the merger and acquisition costs until January 1998. Accordingly, the costs at issue arose during the third sharing period of the first EARP, more specifically, the last six months of the third period, January 1, 1998, to June 30, 1998. The parties initially estimated the costs to be approximately $72 million total, with Missouri's portion being $62 million. However, during its third-period audit, the Staff determined that the estimate was no longer accurate. After an analysis of actual expenses already incurred along with an updated estimate of future costs, a new estimate of the total merger and acquisition costs associated with Missouri was set at $57.4 million. How to amortize these costs became an issue because the amount of shared credits pursuant to the EARP is directly affected by the annual amortization amount.

UE employed a schedule that amortized the costs at an annual amount of $6.2 million (one-tenth of the original cost estimate of $62 million for Missouri's share). This results in an amortization schedule consisting of nine years at $6.2 million with the tenth year at $1.6 million, thus amortizing the full, revised estimate of $57.4 million. UE contends that the second sentence of Section 4 is more specific and creates the mechanism for calculating the amount to be written down each year: "The annual amortization of merger transaction and transition costs will be the lesser of: (1) the Missouri jurisdictional portion of the total Ameren amount of $7.2 million; or (2) the Missouri jurisdictional portion of the total Ameren unamortized

amount of actual merger transaction and transition costs incurred to date." Of course the $6.2 million amount used by UE is less than the substantial amount of unamortized costs incurred to date. Thus, UE argues that the language justifies their figures and that there is nothing in Section 4 preventing the accelerated amortization schedule they propose.

The Staff and the OPC take the position that the amortization schedule should incorporate the most recent and more accurate figures as gleaned from the audit. That would mean using the updated $57.4 million amount for total costs, which would calculate to $5.7 million annually when amortized over ten years. They argue also that UE's approach focuses on the second sentence in isolation from the context of the whole agreement.

The parties skillfully argue their respective positions regarding the meaning of the wording of Section 4 and arrive at two very different conclusions. What is clear from the language is that the parties desired to use actual figures to establish an amortization methodology. This is expressed in the first sentence ("actual prudent and reasonable . . . costs . . . shall be amortized over 10 years"). If actual figures had been available, there would have likely been no controversy. Unfortunately, because the merger was not finalized until late December, the parties were left to use estimates.

The second sentence gives guidance in establishing the amortization amount and by providing an annual cap, which is the Missouri portion of the original estimate of $72 million. (The second portion of the sentence relating to unamortized costs would obviously never come into play as the "lesser" amount.) These figures, $72 million total, and the corresponding Missouri portion, $62 million, have no relationship to anything except that they were the best estimate of costs the parties could arrive at early in the process. This is the only reason UE used the $62 million amount to arrive at the annual amortization amount of $6.2 million. If the estimate had proven accurate, UE was on track to amortize the full amount over ten years. And, it is clear UE intended to book the amortization by dividing the total costs by ten, resulting in equal annual amounts of $6.2 million, which is the type of straight line amortization schedule the Staff urges.

However, once a much more current and accurate amount was established, the $62 million had no relationship to anything in the case. We are left with UE's continued embrace of the outdated calculations that necessitates a switch to some form of accelerated amortization schedule to make the numbers come out right.

We find that the Commission's adjustment regarding the merger and acquisition costs was reasonable and was in no way arbitrary. We believe the adjustment was based on a fair reading of Section 4 and captures the parties' intent to use as close to actual cost amounts as possible. Applying the annual amortization amount of $5.7 million was based on the most current and accurate information available. This approach allows UE to fully realize the benefit of recovering its merger and acquisition costs. As to this issue, UE's point of error is denied.

In summary, the Commission did not have unfettered discretion to make changes or adjustments relating to the EARP. The Commission's responsibility under the EARP for resolving disputes and making adjustments is still grounded in the principles of law just as firmly as if this were a regular rate case. The Commission's Order did not do injustice to those principles or to the terms of the EARP. The four adjustments made by the

Commission were supported by competent and substantial evidence. They were reasonable, not arbitrary or capricious, and were not against the weight of the evidence. "In reviewing the reasonableness of an order of the Commission, the court considers the evidence in the light most favorable to the agency together with all reasonable supporting inferences; if the evidence permits either of two opposite findings, the court must defer to the findings of the Commission," and "[o]nly when a Commission order is clearly contrary to the overwhelming weight of the evidence may a court set it aside." *Friendship Vill. of S. County*, 907 S.W.2d at 345. Point II is denied.

### D. Were the Commission's four adjustments to the sharing credit constitutional?

In its final three points, UE raises several arguments attacking the constitutionality of the Commission's four adjustments to the sharing credit. In Point III, UE argues an impairment of its contract rights in violation of the contract clauses of the Missouri (art. I, § 13) and Federal (art. I, § 10, cl.1) Constitutions. Point IV contends that the adjustments run afoul of the takings clauses of the Missouri (art. I, §§ 26 & 28) and Federal (amends. V & XIV) Constitutions in that they constitute a taking of UE's contract rights and a repudiation of its reasonable, investment-backed expectations. Finally, in Point V, UE alleges that the adjustments amount to retroactive lawmaking in violation of the due process clauses of the Missouri (art. I, § 10) and Federal (amend. V) Constitutions by changing the legal consequences of a past transaction and agreement.

All of the constitutional claims are grounded on the premise that UE's contract rights were impaired and/or property rights confiscated because the Commission deviated from the Stipulation and Agreement to make adjustments that changed the legal consequences of the bargain and the expectations of the parties. In essence, UE's claim is that the Commission exceeded its authority in making the adjustments.

However, we have already resolved these issues by our holdings that the Commission did not exceed its authority; that it properly interpreted and performed its role; and that it resolved legitimate disagreements among the parties as dictated by the terms of the Stipulation and Agreement. And, we have said that the Commission's resolution of the issues was lawful and reasonable. Therefore, whether couched in legal or constitutional terms, UE's claims fail because it was not wrongfully denied any contractual or property rights. Points III, IV, and V are denied.

The Reports and Orders of the Commission are affirmed in all respects.

LOWENSTEIN and HARDWICK, JJ., concur.