**ENVIRONMENTAL UTILITIES,
LLC., Appellant,**

v.

**PUBLIC SERVICE COMMISSION
of the State of Missouri,
Respondent.**

**No. WD 66860.**

Missouri Court of Appeals,
Western District.

April 3, 2007.

**10.** Because of the Court's disposition of this case, all motions still pending are overruled.

Gregory D. Williams, Sunrise Beach, MO, for appellant.

Robert S. Berlin, Jefferson City, MO, for respondent.

Before ULRICH, P.J., LOWENSTEIN and SMART, JJ.

HAROLD L. LOWENSTEIN, Judge.

## I. FACTUAL BACKGROUND

The case at bar concerns the proposed sale of water utility assets memorialized in four separate, interdependent sales agreements. The sale involved the assets of three companies, Osage Water Company,

Environmental Utilities, LLC ("EU"), and the Hurricane Deck Holding Company, all owned in part or in whole by Greg Williams, as well as assets held personally by Williams and his wife Debra. The parties to the sale filed a joint application to the Public Service Commission ("the Commission") for approval of the sale pursuant to Section 393.190, RSMo. (2000). The Commission subsequently dismissed the application for sale as detrimental to the public interest. EU, one of the companies owned by Williams and a party to the application, filed a petition for review of the Commission's decision in the Circuit Court of Cole County. The trial court affirmed the Commission's decision. This appeal followed.

## A. OSAGE WATER COMPANY

Osage Water Company ("Osage Water") is a state regulated water company providing water and sewer service to customers in Camden County. Osage Water had two shareholders, Greg Williams and Pat Mitchell, each holding fifty percent of the common stock. Williams, an attorney, and Mitchell were directors of the company while Williams's wife Debra acted as corporate secretary. Until 2001, Mitchell managed Osage Water under an operating agreement between the utility and Water Laboratory Company, a company owned by Mitchell.[1]

Over time, Osage Water incurred substantial debt, the bulk of which was owed to the two shareholders, Williams and Mitchell, for services rendered. Williams had claims for over $500,000 in legal services. Mitchell had claims for services rendered to Osage Water through another of his companies, Jackson Engineering. Osage Water owed money to other enti-

ties, including the Missouri Clean Water Commission, for unpaid fees, licenses, and fines, and to vendors such as Hancock Construction, a judgment creditor of Osage Water.

In February 2001, Osage Water gave Williams a promissory note to cover its legal debt to Williams. The note was secured by a future advance deed of trust on all property Osage Water owned in Camden County. In July 2001, Mitchell left boxes of Osage Water records on the porch of Williams's law offices with a note that read, "I am tired and broke. You want all the assets you get all the headaches.... Good luck—you will need it."

Williams and his wife Debra then formed Environmental Utilities, LLC, to operate Osage Water. Debra took over the operations of the company. As the financial position of Osage Water further deteriorated, Williams tried to transfer the assets of Osage Water to EU by conveying the deed of trust he held on Osage Water's assets to EU. Debra Williams then commenced foreclosure proceedings on behalf of EU. EU applied to the Commission to be allowed to operate the utility prepatory to purchasing Osage Water's assets at a sheriff's sale. The staff of the Commission obtained a court order to block the foreclosure. The Williams withdrew as officers of Osage Water just prior to the Secretary of State administratively dissolved Osage Water in September 2002 for failure to file its annual report.

## B. RECEIVERSHIP ACTION

In October 2002, the staff of the Commission filed a complaint seeking appointment of a receiver for Osage Water in that Osage Water was unable or unwilling to

---

1. Williams brings this appeal on behalf of EU, but he represented both EU and Osage Water before the Commission until ordered to desist representation of Osage Water by the court in the receivership action. Essentially, EU and Osage Water are alter egos of Williams.

provide safe and adequate service to its customers. In December 2002, the Commission entered its report and order in Case No. WC–2003–0134, finding that "Osage Water is an orphaned corporation with no means of long-term survival." The report concluded:

The combination of systems in poor repair and the lack of money to pay for major, essential repairs to those systems indicates a very grave danger that Osage Water's customers could suddenly find themselves without water and sewer service, and with limited prospects for timely restoration of that service.

. . . .

Osage Water has been effectively been abandoned by its owners and ... is unable or unwilling to provide safe and adequate service. The Commission found that Osage Water is in dire financial condition and that its owners no long wish to be in business with each other. *There is no credible evidence in the record to suggest that those conditions would improve if the utility were returned to the owners after being in the hands of a receiver.* Therefore, liquidation of Osage Water's assets is the best available option.

(Emphasis added.) Osage Water did not file objections to the Commission's findings and conclusions. Shortly after a receivership action was filed and a preliminary hearing held, Osage Water filed for Chapter 7 bankruptcy. The receivership action was stayed until the bankruptcy court dismissed the case at the end of April 2004. In June 2004, the trial court held a hearing on the receivership action; the court found a receivership was appropriate. The court stayed its order, however, pending a proposed sale of Osage Water's assets.

### C. Proposed Sale of Assets

Missouri–American Water Company ("MAWC") is a regulated utility providing water to 445,000 customers in a number of Missouri counties and sewer service to about 100 customers near Parkville. After eighteen months of negotiations, Williams and MAWC reached agreement for the sale of assets held by entities owned or controlled by Williams. The contract for sale was memorialized in four contracts styled Agreements A–D.

Agreement A proposed the sale of a portion of the assets of Osage Water. Agreement B proposed the sale of all EU's assets. The sale of certain assets held personally by Greg Williams and Debra Williams were the subject of Agreement C. Under Agreement D, MAWC proposed to buy the assets of the Hurricane Deck Holding Company, another entity owned by Williams. All four agreements were interrelated in that each was contingent on the execution and closing of the other three agreements. If any contingency in any one of the four contracts failed to be satisfied, MAWC would not acquire any of the assets that were the subject of the four agreements. Although the Commission has no authority to approve or reject the sale of assets set forth in the Agreements C and D, those sales were contingent upon the Commission's approval of the Agreements A and B.

The agreements were rife with conditions precedent, most of which were subject to the sole approval of MAWC. One of the most significant conditions precedent was the requirement that, as part of the approval of the sale of the assets of Osage Water and EU, the Commission would then approve an asset rate base increase sufficient to cover the rate base resulting from this transaction. The sketchy condition of Osage Water's record keeping precluded it from defending a rate increase before the Commission. MAWC was already under a rate increase moratorium

and could not bring a rate case before the Commission even after acquiring the assets. By bootstrapping the rate increase into the asset sale application, MAWC could avoid its rate increase moratorium and pass along the cost of acquiring Osage Water to all the utility's customers. Under the sale agreements, MAWC had the sole discretion to accept or reject any rate base or rate increase as a condition precedent to closing the sale of the assets.[2]

Whether the Commission even had the authority to bootstrap a rate increase into the sale application process is unclear at best. However, the rate increase provision was of prime importance to the purchaser, MAWC, so important, in fact, that MAWC considered the failure to secure a rate increase a "stopping point." Counsel for MAWC told the Commission that:

> [I]f the Commission believes it does not have the authority to address any sort of rate increase in this proceeding because ... it just does not have the lawful authority to do so, I would greatly encourage [the Commission] to issue that order now before we have a four-day hearing that will expend many resources ... because ... that really for Missouri–American is a stopping point.

Thus, the Commission was faced not only with an application for the sale of assets of a distressed utility, but also the question of whether, and how, it could take up a rate increase in conjunction with the joint application.

Moreover, Agreement A did not dispose of all of Osage Water assets. The assets of the seller which provided sewer service to the Cedar Glen Condominiums (the "Cedar Glen assets") were excluded from the sale. The Cedar Glen assets served the bulk of Osage Water's customers, accounting for 208 of its total 345 sewer customers.[3] The title of the Cedar Glen assets was clouded, with as many as five different individuals or entities claiming some title to the assets. The agreements required that Osage Water provide clear title to the assets. Osage Water could not provide clear title to the Cedar Glen assets and these assets were, therefore, excluded from the sale.

The exclusion of the sale of the Cedar Glen assets raised a number of concerns for the Commission. The Cedar Glen customers constituted the bulk of Osage Water's sewer customers and their exclusion would mean that any rate increase to cover any proposed rate base would be spread across a much smaller pool of customers.

---

**2.** The agreements also purported to control how proceeds of the sale would be distributed. While the parties to the Application claimed that the Commission could not control the disposition of the proceeds pursuant to the holding of *State ex rel. Fee Fee Trunk Sewer v. Litz*, 596 S.W.2d 466, 468 (Mo.App. 1980), they asked the Commission to approve an application predicated on contracts that purported to dictate the distribution of the proceeds.

In the proposed distribution, Greg Williams, as a creditor to Osage Water, individual owner of assets to be sold under Agreement B, and as a principal of Hurricane Deck would receive the bulk of the proceeds. Pat Mitchell would also receive proceeds via claims submitted by Jackson Engineering, an entity he

controlled. Funds were included to meet judgments and fines owed to the Department of Natural Resources and the Clean Water Commission. Hancock Engineering, to whom Osage Water owed $262,979.95 to satisfy a judgment and accrued interest, would have received $237,000. The record is unclear how any disputes as to the distribution of assets would have been resolved.

**3.** The Cedar Glen Condominium Owners Association intervened in the application review, requesting that Osage Water be directed to either transfer or sell the Cedar Glen assets to the condominium association as a condition of approval of the application. Both Osage Water and MAWC opposed the request.

The staff of the Commission noted that the remaining customers could see their rates at least double in order to provide recovery of the overall cost of sewer service.

As noted above, Osage Water had been previously adjudged a distressed utility in a prior action before the Commission and was subject to a receivership action in circuit court. Agreement A, as proposed by Williams and MAWC, would leave a substantial number of customers in the hands of a failed utility—a utility unable or unwilling to provide adequate and safe service to the Cedar Glen customers.

When questioned about the Cedar Glen assets, Williams reassured the Commission that the assets would likely be included in the sale. He stated that the parties were working to resolve the title issues and he anticipated "that a contract to convey those assets to Missouri–American will be forthcoming." When the Commission expressed its concern that Williams and Osage Water would not be out of the utility business after the sale, Williams again told the Commission that he anticipated a "near-term sale to Missouri American."

## II. PROCEDURAL HISTORY

On October 5, 2004, MAWC, Osage Water, and EU filed a Joint Application (the "Application") with the Commission for the sale of assets as provided in two of the sale agreements. The Clean Water Commission, Hancock Engineering, and the Cedar Glen Condominium Owners Association (the "Condo Owners"), sought to intervene. The staff of the Commission filed its recommendation that the sale go forth. However, their recommendation was predicated on the sale of *all* of Osage Water's assets, including the Cedar Glen assets, even though these assets were excluded from the sale.

An evidentiary hearing on the Application was scheduled for January 24–27,

2005. After the staff presented its recommendations and the parties responded, the Commission discovered that the joint application raised a number of critical legal issues. On January 7, the Commission scheduled oral argument on the legal issues for January 13, 2005. All parties, including Osage Water, EU, MAWC, the staff of the Commission, the Public Counsel, the Condo Owners, the Clean Water Commission, and Hancock Engineering, were present and had the opportunity to be heard on January 13–14, 2007.

The case before the Commission was not a standard transfer of utility assets case and, therefore, raised a number of unique issues—not least among that of the bootstrapped rate increase. The central issues at the hearing were whether the Commission could approve a rate increase as part of the application and whether the Commission could transfer the Cedar Glen assets to the Condo Owners as part of the Application process. Some parties voiced skepticism about the application, including the Clean Water Commission whose attorney characterized the application as a "clever scheme that allows certain persons to derive maximum benefit from the sale proceeds that are admittedly not going to cover all the obligations to third parties."

The commissioners expressed concern about the exclusion of the Cedar Glen assets. One commissioner noted that "the buyer is not acquiring any assets associated with sewer services provided to the Cedar Glen development, and that obligation to the customers dependent on those facilities will remain with seller or others." Another commissioner expressed concern that Williams would not be "out of the utility business" even if the Application was approved. The commissioners also quizzed Williams about the operations that would remain in Osage Water's hands. One commissioner summed up the difficult

position created by the Application put forth by MAWC and Williams:

> [Y]ou can have a bad actor and that actor can be bad for a long period of time, and then gets to the point that the consumers are so damaged or so injured by that bad actor that the Commission is forced into doing something to help those customers.... Now, we've been given the choice here, let the bad actors receive financial reward by getting the price that they want for transferring these assets, and ... either force the ratepayers to pay that or force another company that has not been a bad actor who is willing to take this over ... to absorb those costs ... [I]t is a terrible situation that this Commission is placed in.

The Commission chairman asked Williams whether the Commission could predicate approval of the Application on a condition "that would permanently bar you or any affiliate of you from ever maintaining ownership in any water, sewer or anything else that would ever come before [the] Commission again."

Despite its evident misgivings, the Commission proceeded forward with the Application even when the parties could not come to agreement on a single list of issues after the January 13 hearing. One week after the hearing, the Commission cancelled the evidentiary hearing set for January 24–27, stating it would issue an order shortly. Neither Osage Water, EU, nor MAWC, objected to the cancellation of the evidentiary hearing.

In its January 25 order, the Commission stated that it was "unwilling to consider the transaction as currently configured ... with only a portion of the Osage system being transferred." To facilitate the inclusion of the Cedar Glen assets, the Commission ordered that AmerenUE, owner of the real property upon which the Cedar Glen assets were located, be joined as a party in an effort to clear title to those assets. In the same order, the Commission ordered the staff to prepare an audit of Osage Water and treat the Application akin to a small company sewer rate increase case to determine how much of an increase would be required to cover the proposed rate asset base.

The staff of the Commission proceeded with the expedited audit and filed its recommendations as to a potential rate increase. The staff performed their rate analysis on two different scenarios. The first rate analysis was performed for the transfer of assets as proposed by the Application in which the Cedar Glen assets were excluded. The second scenario included the Cedar Glen assets in the transfer. As directed by the Commission, the parties to the application responded to the staff's recommendations.

On March 9, 2005, MAWC filed a "Notice Concerning Cedar Glen Sewer" (the "Notice") in which the buyer MAWC unequivocally stated it was "not interested in amending its original application to include entering into a contract to acquire the [Cedar Glen assets]." MAWC, citing uncertainty as to title to the assets, disinterest and negative reaction of the potential customers, as well as the costs and risks associated with the assets, stated that it intended to pursue the Application as originally filed.

In response, the staff of the Commission expressed its concern that the rates for Osage Water sewer customers absorbed by MAWC would have to "be increased dramatically to provide recovery of the overall cost of providing service for the remaining sewer service area." Moreover, the exclusion of the Cedar Glen assets would strand the bulk of Osage Water's sewer customers with a failed utility.

Given MAWC's refusal to include the Cedar Glen assets in the Application, the staff of the Commission moved to dismiss the application. Neither EU, Osage Water, nor MAWC objected to the motion or filed suggestions in opposition.[4] The potential for a dramatic rate increase for customers absorbed by MAWC and the stranding of the Cedar Glen customers with a distressed utility led the Commission to conclude the Application was detrimental to the public interest. The June 9, 2005, order dismissing the application stated that:

> The Commission is not willing to approve any sale transaction that does not dispose of all of Osage Water's operating assets. The transaction proposed by the applicants would require Osage Water to continue to provide sewer service to Cedar Glen until a buyer could be found to purchase and operate that system. The result is not acceptable because Osage Water is unable to safely and effectively operate its current system.... Any transaction that would sell off only a portion of Osage Water's sewer systems would leave that distressed utility to attempt to operate a remnant of its system with dire implications for the service that it would be able to provide to its remaining customers. Such a result cannot be in the public interest.

On June 17, 2005, Osage Water and EU filed a motion for rehearing. EU contended that an evidentiary hearing would show that the quality of the service to the remaining customers serviced by Osage Water would not change. The Commission denied the motion. EU filed a petition for review in the Circuit Court of Cole County on August 11, 2005. Pending review of the Commission's decision, the receivership action went forward and a receiver was appointed for Osage Water on October 21, 2005. The Circuit Court of Cole County affirmed the Commission's dismissal of the Application in March 2006.

## III. DISCUSSION

### A. STANDARD OF REVIEW

■ This court reviews the decision of the Commission rather than that of the circuit court. *Union Elec. Co. v. Pub. Serv. Comm'n*, 136 S.W.3d 146, 151 (Mo. App.2004). "Appellate review of adjudicated proceedings before the Public Service Commission is limited to a determination of the lawfulness and reasonableness of the Commission's actions; lawfulness is determined from the statutory authority of the Commission to act while reasonableness depends on whether the decision is supported by competent and substantial evidence." *State ex rel. Competitive Telecom. v. Pub. Serv. Comm'n*, 886 S.W.2d 34, 38 (Mo.App.1994). Legal issues are reviewed *de novo*. *State ex rel. AG Processing, Inc. v. Pub. Serv. Comm'n*, 120 S.W.3d 732, 735 (Mo. banc 2003). In evaluating the reasonableness of a Commission decision, this court "considers the evidence together with all reasonable supporting inferences in the light most favorable to the Commission's order." *Id.* at 735. Factual decisions of the Commission are accorded a presumption of validity and the party challenging the decision bears the burden of demonstrating that the decision was unlawful or unreasonable. *Friendship Vill. of S. County v. Pub. Serv. Comm'n*, 907 S.W.2d 339, 344 (Mo.App.1995).

### B. ENVIRONMENTAL UTILITIES CLAIMS OF ERROR

In its first claim of error, EU contends the Commission failed to hold a hearing on

---

4. Hancock Engineering, an intervening creditor, filed a document in support of the motion.

the Application and, therefore, did not have an evidentiary basis upon which to find the sale was detrimental to the public interest. In its second claim of error, EU rehashes the same argument stating that the Commission refused to hold a hearing and, therefore, does not have an evidentiary basis for its decision. Each of these Points Relied On deal with the same two questions: (1) whether the Commission held a hearing on the Application as required by Section 393.190 RSMo. (2000); and (2) whether the Commission's decision was based upon substantial and competent evidence in the record.

1. THE ORDER OF THE COMMISSION WAS LAWFUL IN THAT THE COMMISSION CONDUCTED A HEARING ON THE MATTER AS REQUIRED BY SECTION 393.190.

█ EU contends the Commission failed to hold an evidentiary hearing thereby abridging EU's due process rights. EU argues that the Commission held the January 13 hearing for the sole purpose of narrowing the legal issues; thus, the hearing was insufficient and the Commission did not provide the parties the opportunity to introduce evidence as to the Application. Because the Commission did not hold an evidentiary hearing, EU concludes, the order dismissing the Application was unlawful.

█ "An order's lawfulness turns on whether the Commission had the statutory authority to act as it did." *Friendship Vill.*, 907 S.W.2d at 344. Section 393.190, governs the transfer of franchise or property of water and sewer corporations. Under this section a regulated utility proposing a sale of its assets must secure an order authorizing the sale from the Commission. Section 393.190.1. On review of the application, the Commission "shall set the time and place for all hearings and serve notice as required by law." Mo.

Code Regs. Ann. tit. 4, Section 240–2.110(1)(year). Where the action involves mixed questions of law and fact, the Commission may order a joint hearing on any or all of the issues "to avoid unnecessary costs and delay." Mo.Code Regs. Ann. tit. 4, Section 240–2.110(3).

Here, the complexity of the issues raised in the Application dictated that the Commission resolve several threshold legal issues prior to proceeding addressing the factual issues. Accordingly, the Commission ordered a hearing for January 13–14 "on several legal issues, the resolution or clarification of which may determine the scope of the proceedings." The parties were provided notice and all the parties were present at the on-the-record hearing. All parties were given the opportunity to argue the issues before the Commission.

The Commission has the authority to limit the issues addressed at the hearing pursuant to the regulations governing its practice. *See* Mo.Code Regs. Ann. tit. 4, Section 240–2.110(4). Here, the Commission chose to first address the threshold legal issues prior to taking evidence, an approach urged by MAWC. Ultimately, the threshold issues addressed at the hearing proved dispositive: the Commission was unwilling to consider any Application that did not fully dispose of Osage Water's assets, and MAWC would not amend its Application to include the Cedar Glen assets. No further evidentiary hearing was required once this impasse was reached.

Moreover, EU did not object to the January 20 order canceling the evidentiary hearing set for January 24. Indeed, EU did not claim that the Commission had failed to hold an evidentiary hearing until the Commission dismissed the application in accordance with the Commission's staff motion. EU now claims that the Commission should hold an evidentiary hearing that would "show that the approval of the proposed sale would be that sewer custom-

ers in the Cedar Glen Service Area would continue to receive the same service from Osage Water Company that they currently receive." However, as discussed above, Osage Water had been conclusively found to be a distressed utility, unable to provide safe and adequate service to its customers, in a prior proceeding before the Commission. The ability of Osage Water to serve its customers was not a factual issue in dispute. The Commission, having conclusively determined the issue in a prior proceeding, was not required to hold an evidentiary hearing on matters irrelevant and repetitious. Section 536.070(7)-(8).

The Commission held a fully noticed on-the-record hearing on EU's Application on January 13, 2006. The Commission was not required to hold a second hearing on the Application once the legal issues proved dispositive and the only cure for the defect in the Application, namely the inclusion of the Cedar Glen assets, was categorically rejected by MAWC. Therefore, the actions of Commission were lawful.

## 2. THE COMMISSION'S ORDER IS SUPPORTED BY SUFFICIENT AND COMPETENT EVIDENCE IN THE RECORD.

 The standard governing the Commission's review of an application for sale of assets is set forth in *Fee Fee Trunk Sewer, Inc. v. Litz:* "The Commission may not withhold its approval of the disposition of assets unless it can be shown that such disposition is detrimental to the public interest." 596 S.W.2d 466, 468 (Mo.App. 1980). The decision of the Commission is reasonable where the order is supported by substantial, competent evidence on the whole record; the decision is not arbitrary or capricious or where the Commission has not abused its discretion. This court accords evidentiary determinations by the Commission a strong presumption of validity. *Friendship Village,* 907 S.W.2d at 349.

EU argues that the Commission's findings in its June 9 order dismissing the application were unreasonable in that the Commission "failed to establish any evidentiary basis upon which it ... could make a determination that the proposed sale of assets to Missouri–American Water Company was detrimental to the public interest." This court, therefore, reviews the record to determine if the decision was supported by substantial, competent evidence in the record.

 The record in this case consists of the pleadings of the parties, the transcript of the January 13–14 hearing and the admissions of the attorneys made at that hearing, and the unappealed findings of the Commission regarding Osage Water wherein Osage Water was found to be a distressed utility. EU contends that the Commission's reliance on its findings in a prior case wherein the staff of the Commission sought appointment of a receiver was improper and did not provide a basis by which the Commission could find that the sale was detrimental the public interest.

 "Agencies shall take official notice of all matters of which the courts take judicial notice." Section 536.070. Courts may take judicial notice of other proceedings when the cases are interwoven or interdependent. *Smitty's Super Mkts., Inc. v. Retail Store Employees Local 322,* 637 S.W.2d 148, 151 (Mo.App.1982). The Commission took proper administrative notice of its conclusive findings against Osage Water contained in its "Report and Order in Case No. WC–2003–01234," the underlying case that leading to the petition for a receiver. *The 2003 report concluded that Osage Water was a distressed utility and was "unable or unwilling to provide safe and adequate service to its customers."* The sale of assets was precipitated by the Commission's recommendation that a receiver be appointed; therefore, the

cases were closely interwoven. As Osage Water did not object to or appeal the findings of the Commission's 2003 report, the finding that Osage Water was "unable or unwilling to provide safe and adequate service to its customers" was, therefore, conclusive against Osage Water.[5] Section 386.550.

The evidence in the record indicated that the parties proposed a sale of only part of Osage Water's assets leaving the bulk of the sewer customer to be served by the distressed utility. As proposed by the Application, some customers would continue to receive substandard service from a distressed utility. The rest of the customers, those absorbed into MAWC's system, could conceivably see the cost of sewer service double. The Commission could well determine that such a sale was detrimental to the public, consistent with the requirement of *Fee Fee Trunk Sewer*, 596 S.W.2d at 468. The Commission's dismissal was well supported by sufficient evidence in the record and was, therefore, reasonable.

## IV. CONCLUSION

The Commission's concerns, and the evidentiary basis for those concerns regarding any assets left in the hands of Osage Water, are well documented in the record. Williams repeatedly assured the Commissioners that the disputed assets could be sold to MAWC or transferred to the Condo Owners at some later date, effectively after the sale as proposed was consummated. The only option that would effectively

dispose of all of Osage Water's assets in the Application was to include those assets in the sale. The Commission proceeded upon this assumption until MAWC effectively halted the process by unequivocally declaring that the Application would not be amended to include the Cedar Glen assets. Since the Commission could not force MAWC to purchase the assets, the only possible outcome of the Application would be to approve a sale that would leave the bulk of the sewer customers served by a distressed utility or to dismiss the application. Without other recourse, the Commission could not but find the sale proposed by the Application detrimental to the public.

The Commission held a properly noticed, on-the-record hearing at which all the parties were present and addressed the Commission and, therefore, its actions were lawful. From the evidence before it, the Commission concluded that any sale that did not dispose of Osage Water's assets would be detrimental to the public interest. MAWC refused to amend the Application to include the disputed assets. Given the facts before it, the actions of the Commission were lawful and reasonable. The Commission did not err in dismissing the proposed sale of assets. The judgment of the Commission is affirmed.

All concur.

---

5. Indeed, in its 2003 report the Commission anticipated the scenario proposed by the Application, but in the context of a receivership action. The Commission noted that "some of the utility systems of Osage Water might be more easily sold than others. That raises the possibility that economically non-viable systems that still must serve customers might be left orphaned after the more valuable systems are sold." The Commission cautioned the receiver that the assets left in the hands of Osage Water after other assets were sold must be able to be operated effectively. The Application proposed a scenario very close to that anticipated by the Commission whereby viable assets would be transferred to MAWC while the bulk of the assets, encumbered and under-performing, would be left to be operated by the failing utility.